**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TEMPLE UNIVERSITY HOSPITAL, INC.** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| | : | |
| **v.** | : | **NO. 16-1073** |
| | : | |
| **THE UNITED STATES OF AMERICA** | : | |

**KEARNEY, J.**                                                                                    **April 14, 2017**

**MEMORANDUM WITH
FINDINGS of FACT and CONCLUSIONS of LAW**

The Federal Torts Claims Act requires we, like a jury, resolve fact disputes and evaluate witness credibility when a hospital sues the United States seeking indemnity or contribution towards a multi-million dollar state court settlement based on alleged medical negligence by a labor and delivery doctor deemed to be a federal employee. Following a bench trial, we evaluate the federal labor and delivery doctor's alleged negligence for delivering a baby with several birth injuries. We find, based on a preponderance of the evidence, both the doctor and hospital nurses equally share in the negligence creating an increased risk of harm during hours of inaction, requiring the United States contribute $4,000,000 to the $8,000,000 settlement paid by the hospital to the patients to resolve the state court negligence case.

Our analysis begins with a treating obstetrician referring his 37-week pregnant patient to the Temple University Hospital emergency room for immediate evaluation of decreased fetal movement. Upon the expectant mother arriving midday, the hospital's nursing staff and its labor and delivery doctor noted several non-reassuring factors related to the decreased fetal movements but the doctor failed to immediately attend to them. After three hours of

communication breakdowns between the professionals and after the labor and delivery doctor began and finished a vaginal delivery and an elective caesarian delivery on other patients, the labor and delivery doctor turned his attention to perform a now urgent cesarean upon the mother and shortly thereafter delivered the baby with decreased fetal movements born with several birth injuries. The patients sued the hospital in Philadelphia County state court. After two years of fact and expert discovery leading up to a jury trial with the hospital anticipating liability exceeding $50 million, the hospital settled with the mother and child for $8 million.

The hospital strategically decided not to add the treating labor and delivery doctor as a deemed federal employee in the Philadelphia County jury trial, but after settling for $8 million, now sues the United States alleging the labor and delivery doctor is the only responsible party and the United States must reimburse it for some or all of its settlement payment, plus attorney's fees and interest, under contribution and common law indemnity theories.

Evaluating the credibility of fact and expert witnesses, we now issue post-trial findings under Federal Rule of Civil Procedure 52(a)(1) in support of our accompanying Order entering judgment in favor of the hospital and against the United States for $4,000,000. We find the United States' deemed federal employee equally liable for breaching a standard of care of a labor and delivery doctor and causing the birth injuries. We order the United States reimburse 50% of the reasonable $8 million settlement of a substantial birth injury case awaiting a jury in the Philadelphia Court of Common Pleas. We have no basis for directing the payment of attorney's fees, pre-judgment interest or costs as part of our finding the United States partially responsible on a contribution claim.

## I. Findings of Fact

1.      On February 23, 2012, minor J.M., by and through his parent (collectively "Patients"), sued Temple University Hospital, Inc. ("Hospital") in the Philadelphia County Court of Common Pleas for negligence arising from the obstetrical, labor, and delivery medical care provided to J.M. and his mother S.M. in connection with J.M.'s birth at the Hospital on August 3, 2009 (the "Underlying Action").[1]

2.      Patients, represented by experienced catastrophic injury trial counsel, initially demanded $100 million in settlement.[2]

3.      J.M. is diagnosed with global development delay, spasticity, seizure disorder, dysphagia, quadriplegic pattern cerebral palsy, microcephaly, and visual impairment.[3]  J.M.'s neurological disabilities are permanent.[4]

4.      The Hospital estimated J.M.'s expected future medical costs at $140,000 annually. Patients' life care expert estimated J.M.'s expected future medical costs at $275,000 annually, and assumed J.M.'s life expectancy to age 76.8, the normal life expectancy for a male born in 2009.[5]

5.      By 2014, the Hospital's economic experts estimated the present value of J.M.'s life care plan, designed by Patients' life care expert, to be between $8.6 and $18 million.[6]

6.      Considering J.M.'s potential life expectancy, J.M.'s predicted future medical costs, the potential economic and non-economic damages such as lost earnings and hedonic damages and inflation, the Hospital's experienced defense counsel in the Underlying Action advised it could face a verdict of $50 million or more.[7]

7.      After the close of discovery, with a trial ready date and after deliberations with its Board, the Hospital settled the Underlying Action for $8 million.[8]

8.      The Hospital, having elected to not sue the treating physician in the same suit, then turned to sue the treating labor and delivery doctor Dr. Clinton Turner, a deemed employee of the United States.  Dr. Clinton Turner served as the Hospital's attending obstetrician on the day of J.M.'s birth, rendering medical care and treatment to S.M. and J.M.[9]

9.      At the time of J.M.'s birth, Delaware Valley Community Health Center ("DVCHC") employed Dr. Turner.[10] Neither Dr. Turner nor DVCHC provided care to S.M. or her infant J.M. before the August 3, 2009 birth.[11]

10.     The parties agree DVCHC is a federally funded health center covered under the Federal Tort Claims Act by the Secretary of Health and Human Services.[12]

11.     The parties also agree Dr. Turner is a deemed federal employee acting within the scope of his employment with the Public Health Service.[13]

12.     In August 2009, the Hospital employed all members of the Labor and Delivery Team providing medical care to S.M.[14]

13.     At all times relevant to S.M.'s and J.M.'s treatment, Dr. Turner was the Hospital's ostensible agent who held Dr. Turner out as its employee.[15]

14.     The July 21, 2014 settlement of the Underlying Action extinguished any and all liability of Dr. Turner to Patients.[16]

15.     The Hospital timely submitted a Notice of Claim of the Underlying Action under the Tort Claims Act to the United States on August 17, 2015. The United States denied the claim.[17]

16.     Hospital then sued the United States seeking contribution, contractual indemnity, and common law indemnity.[18]  We dismissed the Hospital's contractual indemnity claim before trial.

**A.    The Underlying Action:  S.M. presents at Triage at Noon.**

17.    On August 3, 2009, at 37 weeks gestation, S.M. met with her obstetrician, Dr. Stanley Santiago, reporting decreased fetal movement.[19]

18.    Dr. Santiago referred S.M. to the Hospital for evaluation in the Labor and Delivery Triage.[20]

19.    Dr. Santiago filled out a Consultation Request form addressed to Triage requesting an "NST" and "AFI" for "complaints of decreased fetal movement."[21] "NST" means non-stress test and "AFI" means amniotic fluid index.[22]

20.    Electronic fetal monitoring is the equivalent of a non-stress test.[23]

21.    The amniotic fluid test provides clinicians with information about the fluid status around the fetus. A normal amount of amniotic fluid indicates a degree of fetal health; an abnormal amount of amniotic fluid suggests a possible problem with the health of the fetus or the mother's water may have broken.[24]

22.    An amniotic fluid test is performed by ultrasound and, in addition to gathering information regarding the status of amniotic fluid, also tells the clinician the status of the mother's uterus, the baby's movement, the tone of the baby, and breathing movements of the baby.[25] Fetal movement, fetal breathing, and fetal tone are all components of a biophysical profile, an assessment tool for fetal health.[26]

23.    S.M. registered with Triage at 12:08 p.m.[27]

24.    The Triage registrar completed the top part of the Labor and Delivery Physicians Triage Record ("Triage Record") noting "CC: dec. [decreased] fetal movement."[28]

25.     In August 2009, the Hospital staffed its Triage with two registered nurses, a first year medical resident, and a nurse practitioner, considered a mid-level clinician.[29] Two attending physicians staffed the Labor and Delivery unit, with patients assigned to one of two "teams."[30]

26.     Nurse Practitioner Sarah Daukaus, a Hospital employee or agent, completed the History of Present Illness ("HPI") section of the Triage Record.[31] Ms. Daukaus noted S.M. "presents with decreased fetal movement. Denies leakage of fluid or vaginal bleeding."[32]

27.     Registered nurses employed by, or agents of, the Hospital set up and monitored bedside fetal monitoring.[33]

28.     The Hospital began fetal heart rate monitoring at 12:19 p.m.[34]

29.     At 12:23 p.m., Nurse Omalabake Fadeyibi noted decreased fetal movement on the OB Nursing Triage form.[35]

30.     At 12:30 p.m., Nurse Fadeyibi noted a baseline fetal heart rate of 135 beats per minute ("BPM"), irregular contractions, no accelerations or decelerations of the fetal heart rate, and absent long term variability in the fetal heart rate.[36]

31.     Nurse Practitioner Daukaus noted on the Triage Record fetal heart tones ("FHTs") of "130-nonreassuring."[37]

32.     In August 2009, the term "non-reassuring" meant the heart rate pattern raises a concern the fetus may be in distress; in other words, the heart rate does not "reassure" the clinician of the fetus' well-being.[38]

33.     The term "non-reassuring," no longer used to describe fetal heart rates, is considered an imprecise term used to describe a wide variety of fetal heart tracings. The term "non-reassuring" does not necessarily mean an ominous tracing and does not necessarily mean a tracing needing immediate delivery; it could mean either of these situations, but it could also

mean a tracing requiring further evaluation. It is generally not considered "good," but does not necessarily indicate "bad."[39]

34.     Dr. Turner testified although the term "non-reassuring" is broad, he understood S.M. as "having some problems with her heart tones," but he didn't "know exactly what they are."[40]

35.     Dr. Turner admitted "non-reassuring" could include decelerations and late decelerations, and he expected the nursing staff to report decelerations but did not receive such information.[41]

36.     A fetal heart rate tracing looks at the base line heart rate and the variability in the heart rate. An absence of long term variability in the heart rate is generally considered an unfavorable sign of fetal well-being.[42]

37.     While a fetal heart monitor records the heart rate of the fetus, it is also recording the mother's uterine contractions and the effect of the contractions on the fetal heart rate. A "deceleration" is a fall in the fetal heart rate. "Late" decelerations are an unfavorable sign and indicate a drop in fetal oxygen with a contraction and a resulting drop in fetal heart rate.[43]

38.     "Accelerations" are an increase of the heart rate with fetal movement. Acceleration with fetal movement is considered a reassuring finding.[44]

39.     Decreased fetal movement is an indication of impending problems, as fetuses experiencing hypoxemia - a decrease in oxygen - will stop moving in response to the condition.[45]

40.     Nurse Practitioner Daukaus testified she considered the fetal heart "non-reassuring" because she found no accelerations in the fetal heart rate; found decelerations in the fetal heart rate; and found minimal variability of the fetal heart rate. However, she did not make a note of these specific findings in the medical record.[46]

41.     On the assessment and plan ("A/P") section of the Triage Record, Nurse Practitioner Daukaus noted the non-stress test and amniotic fluid index as "cancelled" despite Dr. Santiago's request for these tests.[47]

42.     The Hospital performed the equivalent of a non-stress test on S.M. while in Triage, as requested by Dr. Santiago, when it placed S.M. on the fetal monitor.

43.     The Hospital did not perform an amniotic fluid index test in Triage. Nurse Practitioner Daukaus did not perform the amniotic fluid test in Triage because of Dr. Turner's later decision to admit S.M., and she assumed the test would be performed by in Labor and Delivery.[48]

44.     Nurse Practitioner Daukaus did not note in the medical record Dr. Turner cancelled the amniotic fluid test.[49]

45.     Dr. Turner denies telling Nurse Practitioner Daukaus to cancel the amniotic fluid test.[50]

46.     Nurse Practitioner Daukaus communicated with Dr. Turner about S.M.'s decreased fetal movement and placement on the fetal monitor and her assessment the strip looked "non-reassuring."[51]

47.     Nurse Practitioner Daukaus noted "reviewed with Dr. Turner" on the Labor and Delivery Triage Record.[52]

48.     Nurse Practitioner Daukaus completed a four-page Obstetrics History and Physical Examination ("Obstetrics H & P") form at 12:55 p.m.[53]

49.     Nurse Practitioner Daukaus started the Obstetrics H & P form while S.M. was still in Triage noting: "decreased fetal" under History Presenting Illness; "NST FHR non-reassuring" under the Physical Examination section.[54]

50.     Nurse Practitioner Daukaus completed the Assessment and Plan of Care section of the Obstetrics H & P form.[55] The assessment noted "reduced fetal movement" and a "non-reassuring strip" and the plan included admission in anticipation of delivery, electronic fetal monitoring, and administration of intravenous ("IV") fluids.[56]

51.     At some point between 12:19 and 12:55, Nurse Practitioner Daukaus checked a box on the Obstetrics H & P form indicating she notified the attending physician, Dr. Turner.[57]

52.     We find Nurse Practitioner Daukaus' testimony credible as to her communications with Dr. Turner.

53.     We find Dr. Turner spoke to Nurse Practitioner Daukaus no later than 12:55 p.m. about S.M.'s complaint of decreased fetal movement and assessment of non-reassuring fetal monitoring strips and, based on his conversation with Nurse Practitioner Daukaus, Dr. Turner decided to admit S.M. into the Hospital's Labor and Delivery unit.[58]

54.     Nurse Practitioner Daukaus did not have the authority to admit patients.[59]

55.     Dr. Turner does not recall the conversation he had with Nurse Practitioner Daukaus or whether the conversation occurred by phone or through a nurse. Dr. Turner assumes a conversation occurred based on Nurse Practitioner Daukaus' note in the medical record.[60]

56.     Dr. Turner admitted if he does not hear from either the nursing staff or residents, he assumes either "everything is okay" or the evaluations are not yet completed and the staff has not gotten back to him.[61]

57.     Dr. Turner testified in the absence of hearing otherwise, he "just go[es] right on by doing [his] daily activities."[62]

58.     When asked why he did not call for a cesarean section when told about S.M.'s fetal heart tracings and decreased fetal movement, Dr. Turner testified a non-reassuring fetal

heart tracing does not "tell [him] a lot" and, had he been told of repetitive late decelerations and no variability, "that's a different thing."[63]

59.     Even if he knew S.M. had experienced recurrent late decelerations, he would still employ interventions to try to resolve the situation before performing a cesarean section.[64]

60.     When Dr. Turner learned of S.M.'s non-reassuring fetal heart tracing at the time of admission, he did not ask anyone for the basis of the non-reassuring assessment because he expected the residents to evaluate S.M. and give him updates on her status and assumed other staff members would keep him up to date.[65]

61.     Dr. Turner delivered Patient #26—not J.M.—by operative vaginal birth at 1:04 P.M.[66] Dr. Turner estimated he went to the delivery room for Patient # 26 at approximately 12:45 or 12:50 p.m.[67] Dr. Turner estimated he stayed with Patient # 26 for another thirty to thirty-five minutes after the 1:04 p.m. delivery.[68]

62.     Dr. Turner decided to admit S.M.[69]

63.     The Hospital, at Dr. Turner's order, admitted S.M. to Labor and Delivery at 1:22 P.M.[70]

64.     We find Dr. Turner's explanations for his lack of personal attention to S.M. upon her presentation during her seventy-plus minutes at the Hospital are not entirely credible. Having evaluated the expert testimony, Dr. Turner's standard of care must include attention to patients presenting with exceptional concerns expressed by the referring obstetrician and the professional staff.   We do not find the standard of care allows a doctor to transfer his entire responsibility, described by the United States' expert as "captain of the ship", entirely to nurses and residents.  We find it much more likely he did not view S.M.'s non-reassuring decelerations as requiring his expertise absent someone telling him to evaluate S.M.

**B. Post-admission treatment also lacks communication and attention.**

65.     Once Dr. Turner admits a patient to Labor and Delivery, the Hospital's Labor and Delivery nurses and professionals place the patient on a fetal monitor and the nursing staff is responsible for monitoring and regularly assessing the fetal monitor.[71]

66.     The Hospital's nursing staff is expected to check the fetal monitoring strips every 30 minutes and every 10 minutes when a patient is close to delivery. The Hospital expects nurses to document fetal heart monitoring results every 30 minutes and to report a problem to a physician or a resident if a problem is identified. Reporting to a physician may an oral report, but an oral report must be noted in the record.[72]

67.     The standard of care in documenting fetal monitoring strips requires an assessment and documentation to accurately reflect the tracing in the medical record, and such documentation should be made every 30 minutes. The standard of care requires documentation every 15 minutes where there is a non-reassuring strip.[73]

68.     Nurses are expected to document the fetal heart rate, the character of the fetal heart rate, whether there are accelerations or decelerations, the variability, and the patient's response to interventions.[74]

69.     The Hospital's policy on managing non-reassuring fetal heart rate tracing provides a nurse "may initiate specific treatment" in response to a non-reassuring fetal heart tracing. The treatment is referred to as nursing "interventions" and includes repositioning the patient, oxygen by facemask, and increasing I.V. fluids.[75]

70.     The Hospital's nursing staff may initiate interventions without physician orders.[76]

71.     The Hospital's policy requires documentation of: the type of deceleration; interventions administered and the response or lack of response in the fetal heart tracing; physician notification and his/her response; and any planned treatment for the patient.[77]

72.     If a nurse finds a non-reassuring strip, and interventions have not improved the situation, nurses are expected to notify a physician and continue using the interventions.[78]

73.     Upon admission to Labor and Delivery, Gul Shabon, R.N. became S.M.'s primary nurse.[79] Nurse Shabon restarted the fetal monitor at 1:24 p.m.[80]

74.     Nurse Shabon's responsibilities included monitoring fetal heart tracings, reporting abnormalities, and performing interventions where monitoring showed abnormalities.[81]

75.     Fetal heart rate monitors are visible on computer monitors posted throughout the Labor and Delivery Unit, including at nursing stations and physicians' break room.[82] In the first thirty minutes after admission to Labor and Delivery, Nurse Shabon found no improvement in the fetal heart tracings.[83] Nurse Shabon does not remember if she told the charge nurse about the fetal heart strips.[84]

76.     Nurse Shabon documented only one deceleration despite other decelerations on the strip.[85]

77.     At 2:10 p.m., Nurse Shabon noted in the medical record Dr. Erin Myers, a first-year resident, obtained consent forms from S.M.[86] Dr. Myers did not examine S.M. or review the fetal heart tracings.[87]

78.     Nurse Shabon does not remember whether she notified a physician of S.M.'s status, but recalls two residents, Dr. Myers and Dr. Espaillat, came into S.M.'s room. Nurse Shabon does not remember what she said to Dr. Meyers or Dr. Espaillat. Nurse Shabon did not note in the medical record any abnormal fetal heart tracings.[88]

79. S.M. waited for Dr. Turner's direction.[89]

80. As of 1:30 p.m., at the conclusion of Patient # 26's case, Dr. Turner had not examined S.M.[90]

81. Dr. Turner testified he had no reason to examine S.M. based on the information he received from nursing staff.[91]

82. As of 1:35, Dr. Turner knew of S.M.'s admission, a history of some period of time of decreased fetal movement, and a non-reassuring fetal heart tracing.[92]

83. Dr. Turner testified he expected the nursing staff in Labor and Delivery to take interventions such as administering I.V. fluids, providing oxygen, and changing the position of the patient to improve fetal heart rate.[93]

84. Dr. Turner testified he expected the nurses to keep him updated.[94]

85. For reasons never credibly explained, the professionals and Dr. Turner moved to an elective surgery while S.M. waited for care.[95]

86. After leaving the delivery of Patient # 26, and without visiting or assessing S.M., Dr. Turner chose to begin with Patient # 27, an elective cesarean section.[96]

87. At 1:35 p.m., Dr. Turner went into the operating room on the Labor and Delivery unit to deliver Patient # 27, signing a "time out protocol."[97] As the name suggests, a "time out protocol" requires the physician to take a "time out" before the procedure to verify the patient and proper procedure to be performed.[98]

88. Dr. Turner testified he estimates he "scrubbed in" for Patient 27's cesarean section around 2:00 p.m.[99] He delivered Patient # 27's baby at 2:34 p.m.[100] A third-year resident, Dr. Zandomeni, assisted Dr. Turner with the delivery of Patient # 27.[101]

89.     Between the 1:35 p.m. time-out for Patient # 27 and before "scrubbing in" around 2:00 p.m., and before Dr. Espaillat performed the biophysical profile on S.M., Dr. Turner testified he could have gone to S.M.'s room, located close by the operating room, and could have pulled up S.M.'s fetal heart monitoring to review.[102]

90.     Dr. Turner testified he had no reason to do so because the staff had not reported anything to him.[103]

91.     We find Dr. Turner's "no reason" mantra to lack credibility given the facts told to Dr. Turner upon admission.  Dr. Turner's attempt to shift all the blame to the Hospital's nursing staff and other professionals belies his central role.  He is the treating physician and not just there to react to stimuli from others who point him in a certain direction.  He must take responsibility and prioritize patients. The Hospital shares in this obligation but the treating physician must fulfill his standard of care.

92.     Dr. Turner believed the "overwhelming majority" of non-reassuring fetal heart tracings correct themselves with intervention and, having no information from the residents or nursing staff, assumed S.M.'s status improved or evaluations were not yet complete.[104]

93.     There is no documentation in the medical record of physician notification after 12:55 p.m., and there is no documented evidence of repositioning S.M. or administering S.M. oxygen.[105]

94.     With respect to physician notification, there is nothing in the medical record from 12:55 p.m. to 2:50 p.m. of any notification to a physician.[106] We have no understanding why the Hospital's nursing staff did not notify Dr. Turner of S.M.'s condition.

95.     Dr. Luis Espaillat, a second-year resident in obstetrics and gynecology, arrived on the Hospital's Labor and Delivery unit in the early afternoon and began reviewing fetal monitor strips.[107]

96.     Dr. Espaillat reviewed S.M.'s fetal monitor strips on the computer monitor located in the residents' lounge. After reviewing S.M.'s fetal monitor strip, Dr. Espaillat went to S.M.'s room to examine her because he "didn't like her tracing" and thought "it was a little too flat," explaining he did not see "a lot of variability" in the tracing of the fetal heart rate.[108]

97.     At 2:50 p.m., the medical record shows Dr. Espaillat performed a biophysical profile by ultrasound on S.M.[109] As a second-year resident, Dr. Espaillat had the authority to perform a biophysical profile without first getting permission from an attending physician.[110]

98.     A biophysical profile examines five different components: fetal movement; fetal breathing; amniotic fluid index; gross movements; and the non-stress test which is the fetal heart tracing strip. Each component is given a score of zero if abnormal, or a score of 2 if normal. The scores for each component are added up on a scale of 8 or 10; 10 if the non-stress test (fetal heart tracing) is a component, 8 if the non-stress test is not a component.[111]

99.     S.M.'s biophysical profile resulted in a score of 2. Dr. Espaillat found only the amniotic fluid test normal, for a score of 2; all other components received a zero.[112]

100.     Dr. Espaillat became concerned about possible acidosis and the lack of oxygen, both of which are detrimental to the health of a fetus.[113]

101.     As a second-year resident, Dr. Espaillat did not have the authority to decide whether S.M. should be delivered.[114]

102.     At some point between 2:50 p.m., when he began the biophysical profile, and 3:10 p.m., when he entered a note on the medical record, Dr. Espaillat reported his findings from

the biophysical profile to Dr. Turner who, at that time, was in the delivery room with Patient # 27.[115]

103.    Dr. Turner admitted the score of 2 on S.M.'s biophysical profile concerned him and is an abnormal finding, but he still wanted additional information including talking to S.M. and examining her to gather more details and to review the monitor strips himself.[116]

104.    Dr. Turner told Dr. Espaillat to start Pitocin to prepare S.M. for delivery and he, Dr. Turner, would examine the patient when he finished with Patient #27.[117] Dr. Turner first testified he remembered discussing only the biophysical profile results with Dr. Espaillat, but then testified he did not tell Dr. Espaillat to start Pitocin.[118] We find Dr. Turner's lack of attention renders his credibility lacking. Dr. Espaillat recalled a direction to start Pitocin to begin the delivery process.

105.    Although his concern level rose after speaking to Dr. Espaillat, Dr. Turner did not tell Dr. Espaillat to locate another attending physician.[119] Dr. Turner testified he did not need to tell Dr. Espaillat to contact the other attending physician because "that's a decision he can make" and, if Dr. Espaillat felt S.M. needed immediate intervention, he could have gone to the other attending physician on the unit as "residents routinely go to the other attending."[120]

106.    At 3:10 p.m., Dr. Espaillat entered a note on the medical record recording the results of the biophysical profile, notice to Dr. Turner, the plan to start Pitocin for the induction of labor ordered by Dr. Turner, and the readjustment of the fetal heart monitor.[121]

107.    There is nothing in the medical record evidencing communication to Dr. Turner regarding S.M.'s condition between the time Nurse Practitioner Daukaus spoke with Dr. Turner by 12:55 p.m. and the time Dr. Espaillat reported his findings to Dr. Turner sometime after 2:50 p.m. and before 3:10 p.m.

108.    Dr. Turner remained with Patient # 27 to close the incision, and did not ask Dr. Zandomeni to close because, as a third-year resident, he felt she needed help to close.[122]

109.    Dr. Turner estimated Patient # 27's cesarean section ended at 3:30 p.m.[123] Dr. Turner testified S.M.'s biophysical profile concerned him, but he did not consider it a "dire emergency" and he felt he could wait until he finished with Patient # 27.[124]

### C. Dr. Turner attends to S.M. almost three hours after knowing of her decelerations and decreased fetal movement.

110.    Dr. Turner estimated he went to see S.M. for the first time at 3:40 p.m.[125] Dr. Turner reviewed the fetal heart monitor strips and upon review of the entire tracing, observed decreased variability and late decelerations.[126]

111.    These fetal strips were available to Dr. Turner on monitors on the Labor and Delivery unit all afternoon.[127]

112.    Dr. Turner's examination revealed S.M. was not in active labor, but he discovered meconium, a sign of distress in the baby.[128]

113.    The medical record shows S.M. in the operating room at 3:56 p.m. to begin administration of anesthesia.[129]

114.    At 4:00 p.m., Dr. Turner entered a note on the medical record of S.M.'s admission for decreased fetal movement and non-reassuring fetal heart rate and for delivery by cesarean section.[130]

115.    Dr. Turner delivered baby J.M. by "urgent" cesarean section at 4:31 p.m.[131]

116.    Dr. Turner never explained why this 4:31 p.m. cesarean section needed to be "urgent," at least as described by the Hospital staff in the admittance register.

117.    Dr. Turner did not request assistance or ask any other physician or healthcare professional at the  Hospital to find another physician to evaluate, examine, or deliver S.M.[132]

118.    Upon birth, J.M. suffered from multiple permanent neurological disabilities.[133]

**D.  Patients' malpractice claim in Philadelphia Court of Common Pleas.**

119.    The Patients wanted to know whether medical negligence caused any or all of J.M. permanent disabilities. They retained Thomas J. Duffy, Esquire, a trial lawyer with experience in birth injury cases in the Philadelphia Court of Common Pleas.

120.    Patients sued the Hospital for negligence in the Philadelphia Court of Common Pleas on February 23, 2012.

121.    The Hospital also retained experienced defense counsel. Its outside defense counsel recommended a settlement in this case, estimating a possible verdict exposure in the Philadelphia County Court of Common Pleas as high as $50 million.[134]

122.    Hospital decided not to sue Dr. Turner in the same case brought by the Patients. The Hospital did not join Dr. Turner in the Underlying Action, triggering removal to federal court, for a number of reasons: the difficulty in managing a bench trial for Dr. Turner as a deemed federal employee versus a jury trial on the claims against the Hospital; and, based on its experience involving the United States defending deemed federal employees, the Hospital's concern it would be in a "two front" battle, defending against the Patients' claims and the United States' anticipated cross-claim including joining other Hospital personnel not named in the Underlying Action.[135]

123.    In the two year history of the Underlying Action, the Hospital assessed the case and identified difficulties in defending the case including the care received by S.M. before delivery; causation, including a concern regarding continued hypoxic injury to J.M.; the nature of J.M.'s injuries and resulting costs of care; the value of lost life pleasure to J.M.; and, concerns regarding the Hospital's experts at trial.[136]

124. As to the development of its causation defense, the Hospital's experts could not rule out ongoing hypoxia contributing to J.M.'s injury from the time of S.M.'s presentation to until delivery. It also faced difficult questions regarding the adequacy of another expert, Dr. Phelan, challenged in other medical malpractice actions.[137]

125. Another of the Hospital's experts in the Underlying Action opined the results of the biophysical profile showed J.M. came to the Hospital with evidence of prior neurologic injury; the results of the biophysical profile required delivery, but not an urgent cesarean section, characterizing the status of fetus as a stable situation indicative of a neurologically injury child; Dr. Turner's actions were within the standard of care; J.M. did not deteriorate from the time S.M. arrived at the Hospital to the time of delivery; and there is no evidence on the fetal monitor strip delivery earlier than 4:31 p.m. would have had any different neurologic outcome.[138]

126. The Hospital had an additional concern about Dr. Espaillat's 3:10 p.m. progress note missing from the original medical record. After J.M.'s delivery and before the medical record left the Labor and Delivery unit, Dr. Turner made copies of certain portions of the chart, including Dr. Espaillat's progress note. For reasons unclear on the record before us, the Hospital never located the original of Dr. Espaillat's progress note, and only received a copy of it when Dr. Turner's attorney in the Underlying Action produced it in discovery.[139] Dr. Turner does not deny asking a clerk to make a copy of S.M.'s medical record.[140]

## II. Evaluation of expert testimony on the three main defenses.

127. The United States raised three main substantial defenses during our non-jury trial: Dr. Turner did not deviate from a standard of care; Dr. Turner did not cause the damage either because the birth injuries existed before Dr. Turner's involvement or the Hospital's nurses

caused the damages and not him; and, the Hospital overpaid to resolve the state court case given J.M.'s potential life expectancy.

**A. Dr. Turner's standard of care.**

*Hospital experts Drs. Manning, McHarg and Elliott.*

128.     The Hospital's first expert Dr. Frank Manning is board certified in obstetrics and gynecology and maternal fetal medicine.[141] According to the United States' expert, Dr. Manning invented the biophysical profile used by Dr. Espillat.[142]

129.     Dr. Manning opined S.M.'s presentation with a history of decreased fetal movement and findings of decreased fetal movement and abnormal fetal tracing on admission created an obstetric emergency requiring intervention by Dr. Turner as the attending physician.[143]

130.     Dr. Manning opined Dr. Turner had an obligation to see S.M. and determine her immediate management including the degree of fetal compromise, whether delivery should occur, and how the baby should be delivered, and, if Dr. Turner could not see S.M. at that time, to arrange for another doctor to see her.[144]

131.     Dr. Manning opined the information on which Dr. Turner had an obligation to act became available to Dr. Turner shortly after S.M. arrived at the Hospital when Nurse Practitioner Daukaus assessed S.M. and spoke to Dr. Turner no later than 12:55 p.m.[145]

132.     Dr. Manning opined Dr. Turner's failure to assess S.M. and make decisions regarding her management at 12:55 p.m. is a breach of the standard of care.[146]

133.     Dr. Manning disagreed with the United States' expert, Dr. Christian Pettker, on the standard of care. Dr. Manning disagreed Nurse Practitioner Daukaus failed to give Dr. Turner information.  Dr. Manning opined Dr. Turner failed to act on the information.[147]

134.    The Hospital also relied upon Dr. Malcolm McHarg's expertise.  He is board certified by the American Academy of Psychiatry and Neurology and qualified as an expert in pediatric neurology.[148]

135.    Dr. McHarg opined J.M.'s neurologic injuries were caused by low oxygen and low blood flow before birth, and the delay in delivering J.M. increased the risk of harm.[149]

136.    Dr. McHarg opined J.M.'s injury "could have and probably did occur prior" to S.M.'s presentation at the Hospital, however, the conditions after presentation at the Hospital did not improve and continued causing injury.[150]

137.    Dr. McHarg cannot state beyond a reasonable doubt injury occurred after S.M.'s presentation at the Hospital.[151]

138.    Dr. McHarg does not agree there is a basis for an opinion all of J.M.'s injury occurred before S.M. presented at the Hospital.[152]

139.    The Hospital also proffered expert testimony on the standard of care from Dr. John Elliott.  He is board certified in obstetrics and gynecology and maternal-fetal medicine.[153]

140.    Dr. Elliott testified decreased fetal movement is a possible warning sign of decreased oxygen delivery, but admitted in 95% of the time or greater a report of decreased fetal movement is a "false alarm."[154]

141.    Dr. Elliott opined the biophysical profile was the final, overwhelming piece of evidence S.M. needed to be delivered; as of 12:55 p.m. the fetal monitor strip showed contractions with late decelerations, minimal variability, and the patient complained of decreased fetal movement, all of which indicated S.M. at 37 weeks gestation "absolutely mandated delivery."[155]

142.    Dr. Elliott opined Dr. Turner delayed delivery from 3:10 to 4:31 p.m., and Dr. Espaillat's report of the biophysical profile results constituted an emergency.[156]

143.    Dr. Elliott opined Dr. Turner should have evaluated S.M. earlier; Dr. Turner knew of decreased fetal movement and Nurse Practitioner Daukaus reported to him a non-reassuring fetal strip.  Dr. Elliott opined if Dr. Turner evaluated S.M.'s fetal heart strip himself, he should have realized baby J.M. was hypoxemic and bordering on acidotic and the combination of decreased fetal movement, no accelerations, minimal variability, and late decelerations mandated delivery.[157]

144.    Dr. Elliott opined Dr. Turner should have evaluated S.M. between the delivery of Patient # 26 and the elective cesarean section of Patient # 27, and delivered S.M. immediately.[158]

145.    Dr. Elliott opined J.M. was not acidotic from approximately 1:00 p.m. to 2:00 p.m., and J.M. became acidotic during the time before delivery.[159]

146.    Dr. Elliott disagreed with the United States' expert Dr. Boyd's opinion J.M's injury occurred one week before admission to the Hospital, opining there is nothing in the pathology report timing J.M.'s injury.[160]

147.    Dr. Elliott disagreed with Dr. Pettker's interpretation the fetal heart tracings showed a negative normal contraction stress test. Dr. Elliott interpreted the tracings as a positive contraction stress test indicating a problem with the fetus, and opined the medical team, including Dr. Turner, had an obligation as the attending physician to evaluate S.M.[161]

### The United States' expert on standard of care: Dr. Pettker

148.    Dr. Christian Pettker, expert witness for the United States, is board certified in obstetrics, gynecology, and maternal fetal medicine.[162]

149.    Dr. Pettker testified to the standard of care regarding a patient such as S.M. with fetal heart strips upon admission. For a patient at 37 weeks pregnancy, presenting with decreased fetal movement, and who is not in labor, the standard of care is to observe further, continue monitoring for another 30 to 60 minutes, and provide resuscitative measures, including repositioning the mother, administering I.V. fluids and oxygen.[163]

150.    Dr. Pettker opined the care Dr. Turner provided to S.M. is consistent with the general practice standard of care.[164]

151.    Dr. Pettker testified the standard of care does not require an attending to check fetal monitoring strips without further information from the nursing staff, even where a patient presents with non-reassuring fetal heart monitor strips.[165]

152.    Dr. Pettker testified where a physician admits a patient but does not receive an update on the status of the patient since the time of admission, the standard of care is the physician would not be expected to check fetal monitoring strips absent a report the patient's condition is worsening.[166]

153.    Dr. Pettker opined Dr. Turner did not know, because the nursing staff did not tell him, of late decelerations and whether S.M.'s condition improved or worsened.[167]

154.    Dr. Pettker opined as the "captain of the ship," Dr. Turner relies on information and reporting from the staff in Labor and Delivery.[168]

155.    Dr. Pettker opined Dr. Turner's actions at the time Dr. Espaillat reported the results of the biophysical profile as appropriate within the standard of care.  Dr. Turner could not have left the operating room of Patient # 27 to examine S.M., and properly told Dr. Espaillat to prepare S.M. for delivery.[169]

156.    Dr. Pettker disagreed with Dr. Manning's opinion S.M. required immediate evaluation.[170]

**B. Cause of J.M.'s injury.**

*Hospital's position: Dr. Turner's delay increased risk of injury.*

157.    Dr. Manning opined on causation. Although he did not know when the process of J.M.'s injury began, Dr. Manning opined when S.M. arrived at the hospital, J.M. exhibited evidence of ongoing hypoxemia insult and continued exposure to hypoxemia is detrimental.[171]

158.    Dr. Manning opined brain injury due to hypoxemia is a progressive phenomenon, and J.M.'s injury continued while he remained undelivered.[172]   Dr. Manning opined hypoxemia can be reversed if it detected when the fetus is in compensation before the fetus deteriorates in utero, and the earlier the intervention, the less damage there will be.[173]

159.    Dr. Manning opined the late decelerations show J.M.'s brain stem recognized a fall in oxygen producing a heart rate change evidencing a functional brain stem. A fetus that is totally decompensated does not exhibit late decelerations. This evidence, in Dr. Manning's opinion, shows J.M. should have been delivered to prevent continuing injury.[174]

160.    Dr. Manning opined J.M. suffered ongoing progressive hypoxemic injury while in utero, specifically between 12:17 p.m. and the time of deliver at 4:24 p.m.[175]

*The United States' first causation position: likely pre-existing injury eliminates causation.*

161.    Dr. Theonia Boyd, expert witness for the United States, is board certified in anatomic pathology and pediatric pathology and qualified as an expert in placental pathology.[176]

162.    Dr. Boyd examined five slides of S.M.'s placental tissue.[177]

163.    Dr. Boyd drew two conclusions from examining S.M.'s placental slides: (1) there is evidence in the placenta of nonacute blood flow restrictions which began "remotely" from

labor and delivery; and (2) there is evidence of nonacute fetal stress from the relative lack of oxygen because of the blood flow restrictions.[178]

164.  Dr. Boyd opined the timing of the event – blood flow restrictions – occurred days to weeks before delivery, with Dr. Boyd estimating a minimum of one week before delivery.[179] Dr. Boyd's minimum of one week is a "rough estimate" and it "could be so many weeks beyond or earlier than that" but she could not definitely opine because once a certain pattern in the placenta appears, the finding does not change.[180]

165.  As to the second conclusion, Dr. Boyd opined the timing of the event – hypoxic stress where the fetus' body registers it does not receive a normal amount of oxygen – occurred days and possibility a week or more before the August 3, 2009 birth.[181]

166.  Dr. Boyd opined the cause of J.M.'s hypoxia is a result of flow restriction between the placenta through the umbilical cord to the baby.[182]

167.  Dr. Boyd attributed the restriction of blood flow to a problem with the umbilical cord.[183]

***The United States' second causation position: nurses caused the injury and not Dr. Turner.***

168.  The United States offered the expert testimony of Katherine Bizal, R.N. on the nursing standard of care.

169.  Nurse Bizal opined the Hospital's nurses failed to implement nursing interventions for the nonreassuring fetal heart rate strip; failed to document if interventions were done if at all; and failed to communicate with care providers.[184]

170.  Nurse Bizal found no documentation of physician notification after 12:55 p.m.; no evidence of repositioning S.M.; no evidence of the administration of oxygen.[185]

171.    With respect to physician notification, Nurse Bizal testified there is nothing in the medical record from 12:55 p.m. to 2:50 p.m. of any notification to a physician.[186]

172.    Nurse Bizal opined the Hospital's nursing staff did not comply with the Hospital's policy on management of nonreassuring fetal heart tracing, and specifically decelerations, because Nurse Shabon documents only one deceleration despite other decelerations on the strip.[187] This includes failure to document decelerations while in triage.[188]

173.    Nurse Bizal opined the standard of care in documenting fetal monitoring strips requires an assessment and documentation to accurately reflect the tracing in the medical record, and such documentation should be made every 30 minutes.[189] The standard of care requires documentation every 15 minutes where there is a nonreassuring strip.[190]

174.    Nurse Bizal opined the nursing staff did not comply with the Hospital's policy on fetal monitoring charting and management because they did not properly document the medical record and provide an accurate assessment of the overall fetal and maternal wellbeing through documentation.[191]

175.    Nurse Bizal testified she identified a total of 17 decelerations each of which should have been documented under the standard of care and Hospital policy.[192]

176.    The Hospital offered the expert testimony of Dr. David Acker on the nursing standard of care. Dr. Acker is board certified in maternal fetal medicine.[193]

177.    Dr. Acker opined the Hospital's nurses met the standard of care, finding in all aspects of assessment, care, and documentation; the nurses followed policies, used the chair of command to report to Dr. Turner;  met all applicable standards of care expected in Labor and Delivery and Triage.[194]

178.    Dr. Acker opined Nurse Practitioner Daukaus communicated to Dr. Turner regarding S.M.'s nonreassuring strips, but admitted there is no record of any communications from the nursing staff to Dr. Turner after Daukaus' conversation with him.[195]

179.    Dr. Acker opined Nurse Practitioner Szott accurately interpreted the fetal monitor strip under the Hospital's policies and communicated it to Dr. Turner.[196]  Once S.M. is admitted to Labor and Delivery, Dr. Turner is "in charge."[197]

**C.  Reasonableness of the $8 million settlement.**

*The United States' argument: Hospital paid too much for life care.*

180.    The United States offered Dr. Robert Shavelle, a Ph.D. in applied statistics and fellow in the American Academy for Cerebral Palsy and Developmental Medicine, as an expert in life expectancy for children with cerebral palsy.[198]

181.     Dr. Shavelle reviewed the life-care plans submitted in the Underlying Action and opined on the statistical life expectancy of a child similar to J.M. born with cerebral palsy in 2009.[199]

182.    Dr. Shavelle opined the life expectancy in late 2013 or early 2014, life expectancy of a child similar to J.M. is approximately 20 additional years from age 4 (born in 2009).[200]

183.    Dr. Shavelle testified the percentage of children similar to J.M. living to age 70 is about 1 percent, and to age 74, one-half of 1 percent.[201]

184.    The United States also offered expert witness Dr. Edward Mathis, an expert in forensic economics.[202]

185.    Dr. Mathis reviewed Dr. Shavelle's report on life expectancy, and opined the economic damages would be reduced if life expectancy is reduced to age 20 to 24 years old.[203]

*The Hospital's arguments based on facts known at settlement.*

186.     The Hospital settled the Underlying Action in July 2014, after its senior counsel evaluated the case with its defense counsel; internally investigated the allegations of the complaint; retained experts to review the medical records; conducted an independent medical examination of J.M.; considered Patients' expert reports; considered J.M.'s condition; economic projections; and, after presentation to the Hospital Reserve Committee.[204]

187.     Richard Margulies, Esquire, represented the Hospital in the Underlying Action. Mr. Margulies and his law firm recommended a settlement in this case, estimating a possible verdict exposure in the Philadelphia County Court of Common Pleas as high as $50 million.[205]

188.     Mr. Margulies testified to the difficulties in defending the case including the care received by S.M. prior to delivery; causation, including a concern regarding continued hypoxic injury to J.M.; the nature of J.M.'s injuries and resulting costs of care; and concerns regarding the Hospital's experts at trial.[206]

189.     Mr. Margulies testified his law firm retained a pathology expert who could not give the Hospital an opinion the injury occurred before S.M.'s arrival at the Hospital and with regard to the possibility of continuing injury from the time of S.M.'s admission to delivery.[207]

190.     Mr. Margulies testified to concerns regarding Dr. Espaillat's 3:10 p.m. progress note missing from the original medical record.  Mr. Margulies testified after J.M.'s delivery and before the medical record left the Labor and Delivery unit, Dr. Turner made copies of certain portions of the chart, including Dr. Espaillat's progress note. Dr. Turner's attorney in the Underlying Action produced Dr. Espaillat's progress note during discovery.[208]

191.     Mr. Margulies testified the Hospital's economics expert relied on the Patients' life-care plan which assumed a life expectancy of age 75.[209]

192. Mr. Margulies testified the Hospital and the Patients each had economic experts and life-care plans, and the jury would evaluate life expectancy in dispute, with both parties' experts' opinions to be considered and determined by the jury.[210]

193. Analyzing and valuing a life care plan is one aspect of damages. The Hospital also needed to consider the hedonic damages potential.

194. The Hospital's expert, A. Roy DeCaro, Esquire, credibly opined on the reasonableness of the $8 million settlement given the potential of a large verdict; the Hospital's experts estimating future medical costs in the range of $8 to $15 million; the potential risks of the Hospital's defense of the case including liability and causation; issues with the Hospital's experts on causation; sympathetic parties; trial in the Philadelphia County Court of Common Pleas; the law of Pennsylvania favoring plaintiffs generally, and the facts of the case.[211]

195. When the Hospital settled the Underlying Action in July 2014, J.M. suffered from permanent neurologic injuries requiring lifelong care to meet his daily needs and substantial medical treatment.[212]

### III. Conclusions of Law

196. Under the Federal Tort Claims Act, district courts "shall have exclusive jurisdiction on civil actions on claims against the United States, for money damages, . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[213]

197. The events of this action took place in Philadelphia. Pennsylvania law applies.

198. Once Dr. Turner is found to be a deemed federal employee and found to be acting within the scope of his employment, the sole remedy for any alleged malpractice by him is against the United States under the Federal Tort Claims Act.[214]

199. There is no dispute DVCHC, a federally funded health center eligible for coverage under the Federal Tort Claims Act, employed Dr. Turner; Dr. Turner is a deemed federal employee acting within his scope of employment with the Public Health Service; and Dr. Turner is an ostensible agent of the Hospital.

200. The Hospital, having elected to not sue the United States' deemed employee in the Philadelphia state court, must now show both Dr. Turner's negligence caused the Patients' injuries <u>and</u> the United States should be entirely responsible under a common law indemnity theory or partially responsible under a contribution claim permitted by the Pennsylvania General Assembly.

**A.  Dr. Turner breached the standard of care causing damage.**

201. We must first determine whether there is sufficient evidence to find Dr. Turner liable for negligence causing injury to the Patients.  To state a claim for negligence under Pennsylvania law, "a plaintiff must allege facts which prove the breach of a legally recognized duty or obligation or the defendant that is causally related to actual damages suffered by the plaintiff."[215]

202. Medical malpractice actions sounding in negligence "can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services."[216]

203.    To prove the duty and breach of duty elements, "a plaintiff must show that the defendant's act or omission fell below the standard of care, and therefore, increased the risk of harm to the plaintiff."[217]

204.    A labor and delivery doctor is required to employ the care and judgment of a reasonable person in rendering care to a patient. Thus, a patient can prevail by establishing a doctor's negligence "without proof of a breach of the standard of care if the [patient] can establish the healthcare provider failed to exercise reasonable care."[218]

205.    When, as here, the fact finder faces diametrically opposed qualified opinions as to the standard of care, we should remember the medical profession is not the sole arbiter of appropriate care.[219]

206.    We find the Hospital's experts credibly defined the standard of care applying to S.M. when she appeared in the Hospital Triage and over the next four hours. We find Dr. Turner had an obligation to do more than rely on nurses and await his next direction. We find Nurse Daukaus credibly testified she told Dr. Turner of S.M.'s medical issues.   He is the "captain of the ship" and, knowing of S.M.'s decreased fetal movements, decelerations and concerns in nursing reports, we cannot fathom a standard of care allowing a labor and delivery doctor to have "no reason" to attend to S.M.   When he did attend to S.M., the delivery of J.M. became urgent. Dr. Turner admits had he known of these facts, he may have acted differently.   We find he knew these facts or possibly overlooked them. As shown below, we hold the nurses equally responsible for not ensuring repeated notice to Dr. Turner.  But we find he had notice and have no credible explanation as to why he did not intervene earlier.  He is not a technician moving from delivery room to delivery room at the nurses' direction.  He is an experienced and, from every indication, otherwise thoughtful doctor.

207.    While Dr. Pettker is an impressive witness, we do not find his standard of care testimony to be credible when, as here, S.M. appears at 12:08 P.M. with a treating obstetrician's note on decreased fetal movements, nursing reports confirming the issue and then the labor and delivery doctor does not check the fetal monitors let alone attend to S.M.  Dr. Pettker's standard of care may apply in a situation where there is sudden onset of injury or lack of information provided to the doctor; we find his opinion is not as credible where there is a claim upon presentation, confirmed by nurses and residents and the doctor does not find "reason" to attend to his patient until after two interim surgeries, including an entirely elective cesarean delivery for Patient #27 while S.M. waited with ongoing fetal distress for at least two hours.    Even Dr. Pettker admitted minimal variability upon admission, intermittent late decelerations and prolonged late deceleration at 2:38 p.m.[220]

208.    Applying the *Incollingo* standard, we find Dr. Turner failed to exercise reasonable care notwithstanding the conflicting doctor-defined "standards of care."    Regardless of Dr. Pettker's standard allowing labor and delivery doctors to defer entirely to nurses and not independently examine S.M., we find Dr. Turner failed to exercise reasonable care as the captain of the labor and delivery ship on August 3, 2009.

209.    If a plaintiff shows a breach of the standard of care, the plaintiff "then must demonstrate 'the causal connection between the breach of the duty of care and the harm alleged: that the increased risk was a substantial factor in bringing about the resultant harm.'"[221]

210.    In *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978), the Pennsylvania Supreme Court applied the Restatement (Second) of Torts § 323 to "relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury as to whether a defendant may be held liable for the plaintiff's injuries: Once a plaintiff introduced evidence a defendant's

negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm."[222]

211.    Under Pennsylvania law, once a plaintiff demonstrates a defendant's acts or omissions increased the risk of harm to another, "such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact."[223]

212.    A plaintiff must make a showing by a preponderance of the evidence: "As on other issues in civil cases, the plaintiff is required to produce evidence that the conduct of the defendant has been a substantial factor in bringing about the harm he has suffered, and to sustain his burden of proof by a preponderance of the evidence. This means that he must make it appear that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."[224]

213.    This case presents a difficult causation question as no doctor can opine the birth injuries exclusively occurred while under Dr. Turner's care for four hours.  Every doctor agrees there is evidence of the injury beginning before midday on August 3, 2009.  The question is whether, given possible additional causes of injury, Dr. Turner's conduct introduced an additional risk affecting the patient's health. This increased risk must constitute a substantial factor in bringing about the injuries.[225]

214.     Proof of increased risk does not necessarily prove causation and the Hospital, largely through Dr. Boyd, argues the outcome would have been the same for the Patients regardless of Dr. Turner's conduct.

215.     While we find Dr. Boyd's testimony is credible as to an earlier onset of problems, she did not, nor could she, opine as to increased risk of harm during the four hours of Dr. Turner's care. We find Dr. Manning and the Hospital's experts credibly explained the ongoing and increased risk to J.M. from delay with ongoing decelerations. Dr. Manning credibly opined hypoxemia can be reversed if detected when the fetus is in compensation before the fetus deteriorates in utero, and the earlier the intervention, the less damage there will be. Dr. Turner essentially admits the immediate need to deliver the baby when he finds out more facts later in the afternoon and moves for an urgent caesarian delivery. Dr. Turner admits if he had been told of repetitive late decelerations and no variability, it's a "different thing" than simply being told nonreassuring.[226] But he still would have tried interventions to resolve. He does not dispute strips show late decelerations but only argues not being told by the nurses.[227]

216.     We find his delay, given the progressive nature of harm to J.M., increased the risk to J.M. While close, we find negligence and causation is shown by a preponderance of the evidence. While we can never know for certain, we find Dr. Manning's credible testimony opining as to a labor and delivery doctor's concern for immediate attention comports with Dr. Turner's understanding. Dr. Boyd's opinion as to the onset of hypoxic stress does not change our finding Dr. Turner and the nurses should have immediately turned to fully evaluate the Patients upon arrival and not automatically assume the decelerating strips here are the same as other cases.

217.     We agree with the United States the Hospital's nurses and staff share a role in this negligence.  We find Nurse Bizal's credible testimony confirms the nurses and staff should have played a more central role in notifying Dr. Turner.  We found admitted instances of undocumented events in treating S.M. The nurses breached a standard of care in their documentation and efforts to find another physician or care for S.M.

218.     But the nurses are not any more responsible than Dr. Turner. This is a shared symbiotic relationship requiring communication and not direction. Dr. Turner is required to do more than show up at delivery tables when directed by nurses.  Conversely, the nurses must do more than rely on a doctor's attention.  Dr. Turner had the right to rely upon information from the nurses.  He claims he did not have all the information and upon learning all the information, moved to an urgent caesarian delivery.

219.     We find Dr. Turner's testimony not credible as to lacking information.  A resident doctor found the information on a monitor and attended to S.M.  Dr. Turner could have examined and monitored.  He did not.  He found "no reason" to attend to S.M.  Dr. Turner agrees if we were to find notice to him, he would have attended to S.M.  We believe Nurse Daukaus, Dr. Espaillat and the medical records confirming, in part, notice to Dr. Turner hours before he turned his attention to J.M.

220.     Under the governing Pennsylvania law, Dr. Turner increased the risk of harm to the Patients by inaction. We recognize the impossibility of precisely knowing J.M.'s *in utero* status at 12:08 P.M compared to birth injuries over four hours later.  But we will not allow Dr. Turner to raise conjecture as to his injuries at 12:08 P.M. compared to 4:31 P.M. when his inaction caused this increased substantial risk of harm.

**B. The Hospital is entitled to contribution for $4,000.000.**

221.    Unlike a direct claim from Patients against the United States where we would focus only on whether the Patients established a medical negligence claim, the Hospital seeks indemnity from the United States or, alternatively, contribution for Dr. Turner's alleged negligence.

222.    Under Pennsylvania law, the right of common law indemnity "rests upon a difference between the primary and the secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable."[228]

223.    Common law indemnity is a "fault shifting mechanism, operable only when a defendant who has been held liable to a plaintiff solely by operation of law, seeks to recover his loss from a defendant who was actually responsible for the accident which occasioned the loss."[229]

224.    Pennsylvania law provides for a statutory right of contribution among joint tortfeasors.[230] "Joint tortfeasor" is defined as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them."[231]

225.    Contribution under Pennsylvania law "exists when a 'joint tortfeasor has discharged the common liability or paid more than his pro rata share,' and the joint tortfeasor's liability 'to the injured persons has been extinguished by the settlement.'"[232]

226. The party seeking either indemnity or contribution must prove reasonableness of the settlement.[233]

227. On its indemnity claim, the Hospital seeks the entire $8 million it paid to settle the Underlying Action plus interest at Pennsylvania's 6% per annum legal rate of interest, attorney's fees and costs incurred in defending the Underlying Action.

228. Under Pennsylvania law, an indemnitee is entitled to attorney's fees and costs incurred in the underlying defense litigation.[234]

229. Contribution, by contrast, is a creature of Pennsylvania statute known as the "Uniform Contribution Among Tort-feasors Act." [235]

230. Pennsylvania law does not permit recovery of attorney's fees, costs or prejudgment interest when succeeding on a contribution claim.

231. The Hospital and Dr. Turner equally share in the negligence and communication breakdowns leading to this delay.

232. Dr. Turner is not solely responsible for the harm and we deny the Hospital's claim for indemnity.

233. The United States is responsible, on a statutory contribution basis, for one half of the reasonable settlement.

234. The Hospital's payment of $8 Million is a reasonable settlement of the Patients' claim in the Court of Common Pleas of Philadelphia County. We find Attorney DeCaro credibly explained, without contradiction, the likely recovery for a plaintiff on this claim before a jury in the Philadelphia state court. The Hospital's internal counsel and experienced medical malpractice counsel valued the case far in excess of $8 Million, including one estimate of $50 Million. The Patients retained highly regarded trial counsel known for winning jury trials on birth injuries in

the state court. The Hospital's main hope focused on convincing a jury of a lack of causation – having the jury find J.M.'s injuries pre-dated the August 3, 2009 presentation. The Hospital, while having some medical expertise consistent with the United States' present arguments of no liability, faced issues with a sympathetic birth injury plaintiff particularly on hedonic damages. The life plan damages are affected by the anticipated truncated life but, even assuming a shorter life span, a jury would consider the reason for the shorter life span. Having evaluated the trial testimony of the key witnesses in our non-jury trial, we can also appreciate the Hospital's concern with Dr. Turner's entire reliance upon nurses' directions as to his next steps. Dr. Turner's credibility would also be challenged by the missing medical record including questions regarding whether removal of a medical record evidences intent to conceal. We found Dr. Turner strained his credibility by attempting to affix all blame for his inaction on nursing actions. He knew his role and failed to meet the standard of "captain of the ship" described by his expert Dr. Pettker.

235.    The Pennsylvania statute authorizing contribution among joint tort-feasors does not mention interest, costs or attorney's fees. We decline to craft a remedy beyond the relief afforded by the General Assembly.

**IV.    Conclusion**

After consideration of several credible medical experts but particularly evaluating the credibility of Dr. Turner, we find the Hospital met its burden of proof of showing Dr. Turner, deemed a federal employee, negligently attended to the Patients on August 3, 2009. Dr. Turner increased the risk of harm to the Patients with inaction for approximately four hours. We find the Hospital's $8 million settlement is a reasonable settlement given the likely hedonic damages and several proof issues before a jury in the Philadelphia Court of Common Pleas. But, as we find

the Hospital and its nurses equally share in the harm to the Patients, we deny the Hospital's indemnity claim but award the Hospital $4,000,000 under the Pennsylvania statutory contribution claim, without interest, costs or attorney's fees.

---

[1] Stipulation of Facts, Joint Exhibit ("J.E.") 1 at ¶ 3.

[2] *Id.* at ¶ 4.

[3] *Id.* at ¶ 50.

[4] *Id.* at ¶ 56.

[5] *Id.* at ¶¶ 5–6.

[6] *Id.* at ¶ 7.

[7] *Id.* at ¶ 8.

[8] *Id.* at ¶¶ 9–10; Notes of Testimony ("N.T.") January 9, 2017 at p. 288 (ECF Doc. No. 76).

[9] J.E. 1 at ¶¶ 19–20.

[10] *Id.* at ¶ 15.

[11] *Id.* at ¶ 19.

[12] *Id.* at ¶ 14.

[13] *Id.* at ¶ 16.

[14] *Id.* at ¶ 20.

[15] *Id.* at ¶¶ 21, 26.

[16] *Id.* at ¶ 11.

[17] *Id.* at ¶¶ 12–13.

[18] *See* Second Amended Complaint (ECF Doc. No. 19). We granted the United States' motion to dismiss the Hospital's contractual indemnity claim (ECF Doc. No. 34, 35).

[19] J.E. 1 at ¶ 23.

[20] *Id*. at ¶ 23.

[21] *Id*. at ¶ 22; J.E. 2-120.

[22] N.T.  January 9, 2017 at p. 37.

[23] N.T. January 11, 2017 at pp. 117-118 (ECF Doc. No. 78).

[24] *Id.* at p. 118.

[25] *Id.* at pp. 118–19.

[26] *Id.* at p. 119.

[27] J.E. 1 ¶ 24; J.E. 2-57.

[28] *Id.* ¶ 29; J.E. 2-57; N.T. January 9, 2017 at p. 123-124.

[29] N.T. January 9, 2017 at pp. 142-143.

[30] *Id.* at p. 145.

[31] J.E. 1 ¶ 29; J.E. 2-57; N.T. January 9, 2017 at pp. 123-124.

[32] J.E. 2-57; N.T. January 9, 2017 at p. 124.

[33] J.E. 1 ¶ 31.

[34] J.E. 2-57; N.T. January 9, 2017 at p. 124; J.E. 1 ¶ 30.

[35] J.E. 10-17; J.E. ¶ 33.

[36] J.E. 2-71; J.E. ¶ 33.

[37] J.E. 2-57; N.T. January 9, 2017 at p. 125.

[38] N.T. January 9, 2017 at p. 33.

[39] N.T. January 11, 2017 at pp. 115–16.

[40] N.T. January 10, 2017 at p. 124.

[41] *Id.* at p. 126.

[42] N.T. January 9, 2017 at p. 34.

[43] *Id.* at pp. 35–36.

[44] *Id.* at p. 37.

[45] *Id.* at p. 32.

[46] *Id.* at pp. 125–26.

[47] *Id.* at pp. 126–27.

[48] *Id.* at pp. 151–54.

[49] *Id.* at p. 154.

[50] N.T. January 10, 2017 at p. 126.

[51] N.T. January 9, 2017 at p. 133.

[52] J.E. 2-57.

[53] J.E. 2-58 through 2-61; N.T. January 9, 2017 at p. 131.

[54] J.E. 2-58, 2-59; N.T. January 9, 2017 at pp. 131-133.

[55] N.T. January 9, 2017 at pp. 133-135.

[56] J.E. 2-60; N.T. January 9, 2017 at pp. 134-136.

[57] J.E. 1 ¶ 35; N.T. January 9, 2017 at p.138.

[58] N.T. January 9, 2017 at pp. 133-134; N.T. January 10, 2017 at pp. 118-120, 128-129.

[59] N.T. January 9, 2017 at p. 129; J.E. 1 ¶ 37.

[60] N.T. January 10, 2017 at pp. 129-130.

[61] *Id.* at pp. 142-143.

[62] *Id.* at p. 143.

[63] *Id.* at pp. 143-144.

[64] *Id.* at p. 144.

[65] *Id.* at pp. 177-178.

[66] J.E. 1 ¶ 38.

[67] N.T. January 10, 2017 at p. 104.

[68] *Id.* at p. 116.

[69] N.T. January 9, 2017 at p. 134; J.E. 1 ¶ 36.

[70] J.E. ¶ 39. The underlying medical record reports a 1:20 P.M. admission.

[71] Margaret Brown, R.N. is the former nurse manager in Labor and Delivery at the Hospital from 2001 through 2016 and, from 2009 to 2012, the nursing administrator for the maternal infant division at The Hospital. Ms. Brown testified to the Hospital's nursing policies in 2009. N.T. January 12, 2017 at pp. 41, 47.

[72] *Id.* at pp. 50–51.

[73] N.T. January 11, 2017 at p. 236.

[74] N.T. January 12, 2017 at pp. 53–54.

[75] J.E. 13-1.

[76] N.T. January 12, 2017 at pp. 48-49.

[77] J.E. 13-2 – 13-3.

[78] N.T. January 12, 2017 at p. 52.

[79] J.E. 2-66; N.T. January 10, 2017 at p. 223.

[80] J.E. 15-9.

[81] N.T. January 10, 2017 at pp. 220-221.

[82] J.E. ¶ 32.

[83] N.T. January 10, 2017 at pp. 224-226; J.E. 2-71, 2-72.

[84] N.T. January 10, 2017 at p. 225.

[85] J.E. 2-72 – 2-73; N.T. January 11, 2017 at p. 228.

[86] J.E. 2-73; Dep. of Dr. Erin Myers at p. 51.

[87] Dep. of Dr. Erin Myers at pp. 52-53.

[88] N.T. January 10, 2017 at pp. 237-39.

[89] *Id.* at pp. 109–10.

[90] *Id.* at pp. 106, 109–10.

[91] *Id.* at pp. 128, 143–44, 182.

[92] *Id.* at pp. 202-203.

[93] *Id.* at p. 136.

[94] *Id.* at p. 138.

[95] *Id.* at p. 109–10, 202.

[96] J.E. 14-1; N.T. January 10, 2017 at p. 202.

[97] J.E. 70-7, 14-1.

[98] N.T. January 10, 2017 at p. 107.

[99] *Id.* at pp. 113–14.

[100] J.E. 14-1, 14-2.

[101] N.T. January 10, 2017 at p. 115.

[102] N.T. January 10, 2017 at pp. 181-182.

[103] *Id.* at p. 182.

[104] *Id.* at p. 183.

[105] N.T. January 11, 2017 at pp. 215-219.

[106] *Id.* at p. 220.

[107] N.T. January 9, 2017 at pp. 164–65, 168, 176.

[108] *Id.* at pp. 167-169.

[109] J.E. 2-73.

[110] N.T. January 9, 2017 at p. 170.

[111] *Id.* at pp. 170-173.

[112]  *Id.* at pp. 173-174.

[113] *Id.* at pp. 174-175.

[114] *Id.* at p. 175.

[115] *Id.* at pp. 175–76.

[116] N.T. January 10, 2017 at p. 150.

[117] N.T. January 9, 2017 at p. 177.

[118] N.T. January 10, 2017 at pp. 148, 151-152.

[119] *Id.* at pp. 151-153.

[120] *Id.*

[121]  J.E. 8-1.

[122] N.T. January 10, 2017 at pp. 200-01.

[123] *Id.* at p. 202; J.E. 1 ¶ 41.

[124] N.T. January 10, 2017 at p. 201.

[125] *Id.* at p. 202.

[126] N.T. January 10, 2017 at pp. 155-157.

[127] J.E. 1 ¶ 32.

[128] N.T. January 10, 2017 at pp. 157-158.

[129] J.E. 1 ¶ 45.

[130] *Id.* at ¶ 46.

[131] J.E. 14-1; N.T. January 10, 2017 at p. 161.

[132] J.E. 1 ¶ 49.

[133] *Id.* ¶ 56.

[134] N.T. January 10, 2017 at pp. 46–47.

[135] N.T. January 9, 2017 at pp. 258–63. It is hard for us to now second guess the Hospital's lawyering strategy in the state court. Through their strategy, it obtained a reasonable settlement of $8 million. This case is different because the United States, as shown here, principally defends Dr. Turner arguing there is no negligence by any professional due to a lack of causation. The Hospital may have benefited from this expertise, although the Hospital obtained a similar opinion of no negligence for Dr. Dein. *See* n. 138, *infra.* We still fail to understand risking a jury trial in the Philadelphia Court of Common Pleas as opposed to a bench trial in this Court, even if the United States' alternative defenses focused on Hospital negligence. We would understand the merits of each Defendant's arguments and are unlikely to be swayed into finding the Hospital liable simply because the United States' experts say so. As a bottom line, the Hospital paid two sets of lawyers and agreed to pay $8 million to avoid a jury resolution in Philadelphia state court but now seeks to allocate some portion of its liability to Dr. Turner in this Court.

[136] N.T. January 10, 2017 at pp. 47–52.

[137] N.T. January 10, 2017 at pp. 47-55; N.T. January 9, 2017 at pp. 270-274, 278; J.E. 36.

[138] N.T. January 10, 2017 at pp. 261–62, 265. The Hospital also considered the opinion supporting its position of no negligence provided by its retained expert Dr. Dein, an obstetrician, in the Underlying Action. Dr. Dein provided an opinion to the Hospital's counsel concluding the actions of all the health care providers at the Hospital including Dr. Turner met the acceptable standard of care. Dr. Dein told the Hospital the fetal heart strips indicated S.M. needed evaluation, needed to be admitted, provided with hydration, monitoring and evaluation with an eye towards delivery. Dr. Dein told the Hospital his interpretation of the "false positive" rates in fetal monitor strips, and the risks of emergency cesarean section outweighed any need S.M. had for the procedure. Dr. Dein told the Hospital the results of the biophysical profile showed J.M. came to the Hospital with evidence of earlier neurologic injury; the results of the biophysical profile required delivery, but not an urgent cesarean section, characterizing the status of fetus as a stable situation indicative of a neurologically injury child. Dr. Dein told the Hospital his opinion Dr. Turner's actions were within the standard of care, and J.M. did not deteriorate from the time S.M. arrived at the Hospital to the time of delivery, and there is no evidence on the fetal monitor strip delivery earlier than 4:31 p.m. would have had any different neurologic outcome. *Id.* at p. 257–66.

[139] *Id.* at pp. 54–58; N.T. January 9, 2017 at p. 268.

[140] N.T. January 10, 2017 at pp. 166–69.

[141] N.T. January 9, 2017 at p. 22. The parties stipulated all witnesses retained to testify as experts in this case are qualified to testify as experts within their respective specialties and subspecialties (J.E. 1 ¶ 2).

[142] N.T. January 11, 2017 at p. 160.

[143] N.T. January 9, 2017 at pp. 28–29, 40–41.

[144] *Id.* at pp. 28–29, 40–42.

[145] *Id.* at pp. 29–30, 69.

[146] *Id.* at pp. 28–29, 41–42.

[147] *Id.* at pp. 79–80.

[148] N.T. January 10, 2017 at p. 3.

[149] *Id.* at pp. 6–7.

[150] *Id.* at pp. 7–8, 19.

[151] *Id.* at p. 10.

[152] *Id.* at pp. 18, 39–40.

[153] J.E. 62-2.

[154] October 11, 2016 Elliott dep. at p. 18.

[155] *Id.* at pp. 28–29, 53–54.

[156] *Id.* at pp. 41–42.

[157] *Id.* at p. 43.

[158] *Id.* at pp. 43–44.

[159] *Id.* at pp. 44–45, 47.

[160] *Id.* at pp. 49–50.

[161] *Id.* at pp. 59–62.

[162] N.T. January 11, 2017 at pp. 102–03.

[163] *Id.* at pp. 122–23.

[164] *Id.* at pp. 164–65.

[165] *Id.* at pp. 165–167.

[166] *Id.* at pp. 167–68.

[167] *Id.* at p. 135.

[168] *Id.* at pp. 135–36.

[169] *Id.* at p. 129.

[170] *Id.* at pp. 155–160.

[171] N.T. January 9, 2017 at p. 70.

[172] *Id.*

[173] *Id.* at pp. 70–71.

[174] *Id.* at pp. 71–72.

[175] *Id.* at p. 75.

[176] N. T. January 11, 2017 at pp. 4, 10.

[177] *Id.* at pp. 12–13.

[178] *Id.* at p. 13.

[179] *Id.* at pp. 15–16.

[180] *Id.* at p. 16.

[181] *Id.* at p. 17.

[182] *Id.*

[183] *Id.* at pp. 41–43, 68.

[184] *Id.* at p. 214.

[185] *Id.* at pp. 215–19.

[186] *Id.* at p. 220.

[187] *Id.* at p. 228; J.E. 13.

[188] N.T. January 11, 2017 at pp. 230, 235–36.

[189] *Id.* at p. 236.

[190] *Id.*

[191] *Id.* at pp. 233–34, J.E. 13-4.

[192] N.T. January 11, 2017 at pp. 238–39.

[193] J.E. 59.

[194] October 17, 2016 Acker dep. at p. 44.

[195] *Id.* at pp. 51–52.

[196] *Id.* at pp. 79–81.

[197] *Id.* at p. 81.

[198] N.T. January 12, 2017 at pp. 2–3, 5.

[199] *Id.* at pp. 6–7.

[200] *Id.* at p. 18.

[201] *Id.* at pp. 36–37.

[202] N.T. January 11, 2017 at p. 75.

[203] *Id.* at pp. 79–80.

[204] N.T. January 9, 2017 at pp. 264–84. The Hospital's Reserve Committee is comprised of approximately 27 people including the Chairman and Chief Executive Officer of the Hospital's health system, the Chief Medical Officer, department chairs, risk managers, and physicians. *Id.* at p. 253. The Reserve Committee authorized the Hospital's senior counsel to settle the litigation. *Id.* at 286.

[205] N.T. January 10, 2017 at pp. 46–47.

[206] *Id.* at pp. 47–52.

[207] *Id.* at pp. 53–54.

[208] *Id.* at pp. 55–58.

[209] *Id.* at pp. 61–62.

[210] *Id.* at pp. 62–64.

[211] N.T. January 9, 2017 at pp. 208–210, 218–221.

[212] J.E. 1 ¶ 58.

[213] 28 U.S.C. § 1346(b)(1). *See Lomando v. U.S.*, 667 F.3d 363, 373–75 (3d Cir. 2011).

[214] 42 U.S.C. § 233(a).

[215] *Green v. Pennsylvania Hosp.*, 123 A.3d 310, 315-316 (Pa. 2015) (citing *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 596 (Pa. 2012)).

[216] *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003).

[217] *Green*, 123 A.3d at 316 (citing *Scampone*, 57 A.3d at 596).

[218] *Estate of Goldberg v. Nimoityn,* 193 F.Supp.3d 482, 489 n.3 (E.D. Pa. 2016) (citing *Incollingo v. Ewing*, 282 A.2d 206 (Pa. 1971)).

[219] *Nimoityn*, 193 F.Supp.3d at 489 n.3. ("In practical terms, *Incollingo* represents an application to medical negligence actions of the principles set forth in Judge Hand's famous decision in *The T.J. Hooper*, 60 F.2d 737 (2d Cir. 1932), limiting the power of the medical profession to be the sole arbiter of what constitutes appropriate care.")

[220] N.T. January 11, 2017, pp. 121–22, 125–26.

[221] *Green*, 123 A.3d at 316 (quoting *Stampone*, 57 A.3d at 596)).

[222] *Hamil*, 392 A.2d at 1286.

[223] *Id.* at 1288.

[224] *Id.* at 1288, n.9 (quoting Comment (a) to Section 433B of the Restatement (Second) of Torts).

[225] *Sacks v. Mambu*, 632 A.2d 1333 (Pa. 1993); *O'Rourke on behalf of O'Rourke v. Rao*, 602 A.2d 362 (Pa. Super. 1992); *Clayton v. Sabeh*, 594 A.2d 365 (Pa. Super. 1991).

[226] N.T. January 10, 2017, pp.143–44.

[227] *Id.* at pp. 145, 157, 189.

[228] *MIIX Ins. Co. v. Epstein*, 937 A.2d 469, 472 (Pa. Super. 2007) (quoting *Builders Supply Co. v. McCabe*, 77 A.2d 368, 370 (Pa. 1951)).

[229] *Sirianni v. Nugent Bros., Inc.*, 506 A.2d 868, 871 (Pa. 1986); *Kinney-Lindstrom v. Med. Care Availability and Reduction of Error Fund*, 73 A.3d. 543, 558 (Pa. 2013) ("[i]ndemnity is a common law remedy which shifts the entire loss from one who has been compelled, by reason of some legal obligation, to pay a judgment occasioned by the initial negligence of another who should bear it.") (quoting *Willet v. Pa. Med. Catastrophe Loss Fund*, 702 A.2d 850, 854 (Pa. 1997)).

[230] 42 Pa. C.S.A. § 8324.

[231] *Id.* § 8322.

[232] *MIIX Ins. Co.*, 937 A.2d at 472 (quoting *Swartz v. Sunderland*, 169 A.2d 289, 291 (Pa. 1961)).

[233] *Id.*; *see also Swartz*, 169 A.2d at 225–226.

[234] *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 117 (3d Cir. 1992).

[235] 42 Pa. C.S.A. § 8321.